Michael Zoldan; AZ Bar No. 028128
**ZOLDAN LAW GROUP, PLLC**
14500 N. Northsight Blvd., Suite 133
Scottsdale, AZ 85260
Tel & Fax: 480.442.3410
MZoldan@zoldangroup.com

Attorneys for Plaintiff
Joshua Hatch

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **Joshua Hatch**, an Arizona resident,<br><br>Plaintiff,<br><br>v.<br><br>**Pearson Education, Inc.** a Delaware corporation;<br><br>Defendant. | Case No.<br><br>**VERIFIED COMPLAINT**<br><br>**(Jury Trial Requested)** |

Plaintiff Joshua Hatch, for his Verified Complaint against Defendant Pearson Education, Inc. hereby alleges as follows:

## **PARTIES**

1. Plaintiff is, and at all times relevant hereto was, a resident of Maricopa County, Arizona.

2. Upon information and belief, Defendant Pearson Education, Inc. is a Delaware corporation with its principal place of business in Hoboken, New Jersey.

3. Pearson is an educational learning company that provides content, assessment and digital services to institutions, governments, schools, colleges and universities, professional bodies, and individual learners.

**JURISDICTION AND VENUE**

4.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the False Claims Act, 31 U.S.C. § 3730(h).

5.  Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in Arizona and Defendant Pearson is located and transacts business through offices in Arizona.

**FACTUAL ALLEGATIONS**

6.  Mr. Hatch commenced employment with Pearson in May 2017 as a VP of Recruitment Services – ASU.

7.  Within his first year of employment, Mr. Hatch exceeded his goals by no less than 20%.

8.  As a result of Mr. Hatch's performance in his first year, he was promoted in June 2018 to a VP of Operations and Strategy.

9.  In July 2018, Mr. Hatch was asked to start a new team to focus on standardizing operations and best practices for all of Pearson's Online Program Management (OPM) partners, starting with the largest opportunity, Maryville University.

10. The new team – which was set to be completed in February 2019 – required a "turnaround" of the existing and poorly performing operations, training, and performance metrics.

11. Within Mr. Hatch's first six months of working on the Maryville assignment, the University's performance had improved from missing goals to achieving or over-

exceeding them.

12. Mr. Hatch's first two major assignments with Pearson were successes.

13. In July 2019, Mr. Hatch was reassigned to ASU.

14. The following month, Mr. Hatch was informed that he would be expected to work the ASU account for an estimated one to two months until Pearson could permanently fill the void of a recently terminated employee, David Botello.

15. Mr. Hatch successfully improved the performance of ASU during the two months he was covering this assignment.

16. On September 9, 2019, Mr. Hatch was provided with a $12,000 bonus for his superb performance on ASU in such a short time.

17. In late 2019 and early 2020, Mr. Hatch was asked to continue his new position while temporarily covering for his prior position, effectively performing two roles: (1) the promoted role with all OPM Operations and Strategy and (2) covering for the ASU assignment.

18. Eventually, given ASU is Pearson's largest OPM partner, Mr. Hatch was instructed to focus his time and effort on ASU by Rod Bristow. As a result of the mandate, Mr. Hatch's newly created Operations team would be left to self-manage.

19. In January 2020, Mr. Stephen Dalla Betta, Mr. Hatch's supervisor, specifically insisted that Mr. Hatch devote 90% of his time to ASU.

20. In February 2020, Mr. Kevin Worrell, a senior Pearson executive, implemented a new compensation and evaluation plan for Pearson employees.

21. According to the plan, Pearson supervisors were instructed to place their subordinate employees' recruitment goals and conversion rates into a program called

Mindtickle. The employees' qualitative metrics – non numerical criterial – were to be separated from the Mindticke data and stored in the employees' HR file. Thus, when it was time to perform the annual review for each employee, the HR file would appear as if recruitment statistics and incentive compensation metrics were not considered, when in reality they were simply stored separately in a different database, Mindtickle.

22. The plan was designed to hold employees accountable for their quantitative performance, and to correlate their salary to that performance, while eliminating the paper trail in the "official" HR file.

23. When an educational institution wishes to receive federal subsidies under Title IV and the Higher Education Act, it must enter into a Program Participation Agreement with the Department of Education (DOE), in which it agrees to abide by statutory, regulatory, and contractual requirements.

24. One of these requirements is a ban on incentive compensation: a ban on the institution's paying recruiters on a per-student basis. The ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20).

25. Pearson receives federal subsidies under Title IV of the Higher Education Act and is therefore subject to Title IV's restrictions, including, but not limited to, prohibiting incentive compensation.

26. When Mr. Hatch learned of the plan's structure, he believed that the plan was designed to disguise unlawful incentive compensation by separating qualitative metrics

(goals) from quantitative metrics (compensation), which amounted to violations of incentive compensation laws and regulations.

27. Mr. Hatch's belief that incentive compensation laws were being violated became more apparent as he learned that Mindtickle information was being copied straight into employees' HR files and was therefore being directly used as part of the employee evaluation and compensation process.

28. In April 2020, Mr. Hatch informed Mr. Worrell that the plan was illegal because it violated incentive compensation laws.

29. Mr. Hatch also informed Mr. Worrell's boss, Mr. Betta, that the plan violated incentive compensation laws.

30. Neither Mr. Worrell or Mr. Betta offered Mr. Hatch a legitimate explanation for the plan or otherwise sought to defend the plan's structure as it would pertain to incentive compensation laws raised by Mr. Hatch's complaints.

31. Less than one month later, in May 2020, Mr. Hatch learned that he was being terminated due to what was described to him as an organization change.

32. During his termination meeting, Mr. Betta and HR Representative, Ms. Nikki Zinman, insisted that the separation had nothing to do with performance and was simply a result of corporate restructuring.

33. However, in less than one month after his termination, Mr. Hatch learned that Pearson had posted two open positions for which he was qualified for at the time of his termination and was performing in those positions.

34. Mr. Hatch sought to fill that vacancy but was informed that he could apply online and compete with the 800+ applicants that also sought the job.

35. Pearson offered no legitimate explanation to Mr. Hatch as to why he was uniformly bypassed for the job opening that he sought within a month after his termination. When Mr. Hatch asked Mr. Dalla Betta and Mr. Bristow about this, and to discuss, the position was immediately taken down after being posted for only three days while Pearson policy is for a position to be posted for at least five days.

36. Mr. Hatch was also not permitted the opportunity to discuss the reasoning for replacing his positions so quickly when he was just told they were not needed.

37. Despite indicating his intent to remain a Pearson employee, the Company made no such effort to retain Mr. Hatch and was determined to separate Mr. Hatch's employment.

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT

38. Plaintiff reasserts and realleges each and every paragraph, supra, as if restated herein.

39. Plaintiff engaged in activity protected under the statute by reporting his concern and belief that the compensation and evaluation plan violated incentive compensation laws, which reasonably could lead to a viable False Claims Act action.

40. Plaintiff engaged in activity protected under the statute by voicing concerns to Defendant that the plan was illegal under incentive compensation laws and, as a result, created a scheme to compensate employees for securing enrollment in violation of Title IV and incentive compensation laws.

41. Plaintiff in good faith believed that the actions of Defendant violated the Title IV's incentive compensation laws, rules, and regulations.

42. Plaintiff in good faith believed that the actions of Defendant meant Pearson's

new compensation and evaluation plan would misrepresent or conceal information about Pearson's method of compensating its employees to the government.

43. Plaintiff in good faith believed that Defendant would continue to be eligible for, and would receive Title IV federal funding, based on misrepresentations or omissions stemming from the plan's design and implementation.

44. A reasonable employee in the same or similar circumstances might believe that Defendant was misrepresenting, concealing, or omitting information to receive federal funding under Title IV and that Defendant would in fact receive Title IV federal funding based on such misrepresentations, concealments, or omissions.

45. Defendant knew that Plaintiff engaged in the protected activity.

46. Defendant knew that Plaintiff's concerns implicated misrepresentations and/or omissions Pearson would make on the government.

47. Defendant discriminated against Plaintiff because he engaged in protected activity under the False Claims Act when it terminated his employment.

48. As a direct and proximate cause of the discrimination to which he was subjected, Plaintiff suffered and continues to suffer lost wages and benefits, loss of health due to stress, humiliation, indignity, and emotional distress.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court order such relief as is necessary to make him whole, including, without limitation:

A. Enter judgment on his behalf against Defendant on the claim contained herein;

B.  Award Plaintiff reinstatement with the same status that he would have had but for the discrimination, two times the amount of back pay, and front pay;

C.  Award Plaintiff compensatory and other damages;

D.  Award Plaintiff his court costs, expenses, attorneys' fees, prejudgment interest, and post-judgment interest;

E.  Declare that Defendant's conduct is in violation of 31 U.S.C. § 3730(h); and

F.  Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED on November 18, 2020.

**ZOLDAN LAW GROUP, PLLC**

By: /s/ Michael Zoldan
   14500 N. Northsight Blvd., Suite 133
   Scottsdale, AZ 85260
   Attorneys for Plaintiff Joshua Hatch

**VERIFICATION**

Plaintiff Joshua Hatch declares under penalty of perjury that he has read the foregoing Verified Complaint and is familiar with the contents thereof. The matters asserted therein are true and based on his personal knowledge, except as to those matters stated upon information and belief, and as to those matters, he believes them to be true.

_____
Joshua Hatch