**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joshua Hatch,<br><br>        Plaintiff,<br><br>v.<br><br>Pearson Education Incorporated, et al.,<br><br>        Defendants. | No. CV-20-02223-PHX-GMS<br><br>**ORDER** |

      Pending before the Court are Defendant NCS Pearson, Inc.'s ("Pearson") Motion for Summary Judgment (Doc. 66) and Expedited Motion to Strike Plaintiff's Statements of Fact and Portions of His Response to Defendant's Motion for Summary Judgment (Doc. 87). Also pending are Plaintiff Joshua Hatch's Motion to Strike Defendant's Statement of Facts (Doc. 75) and Motion for Leave to Refile or Extend Page Limitations (Doc. 91), and the parties' Joint Motion to Seal (Doc. 99). For the reasons below, the Motion to Seal is granted and all other motions are denied.

## BACKGROUND

      Title IV of the Higher Education Act of 1965 is a statutory scheme that gives institutions of higher learning and their students access to federal resources. Arizona State University ("ASU") is a Title IV institution. Because of that status, ASU is required to enter a Program Participation Agreement ("PPA") with the Department of Education in which it certifies it will abide by Title IV's requirements. This includes Title IV's incentive

compensation ban, which precludes ASU from providing any commission, bonus, or other incentive payment to any person or entity engaged in student recruitment activity that is conditioned on their success in securing student enrollments or financial aid awards. *See* 20 U.S.C. § 1094(a)(20); *see also* 34 C.F.R. § 668.14(b)(22). By signing its PPA, ASU applies for (and receives) compensation from the federal government based on its certified compliance with the incentive compensation ban. *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1168 (9th Cir. 2006).

Pearson is not a Title IV institution. Nevertheless, Pearson provides student recruitment services for ASU and is compensated by ASU for those services via tuition sharing, which is subsidized by federal financial aid. Pearson also purports to conduct its business in compliance with Title IV, and in at least some instances, represents that some aspects of its operations are subject to Title IV. (Doc. 100-5 at 6.)

Joshua Hatch was an executive employed by Pearson's Recruitment Services Department from May 2017 until May 2020. In July 2018, he was tasked with creating a team to oversee operations and best practices for Pearson's Online Program Management partners. By July 2019, he was responsible for managing both the Recruitment Services Department's division serving ASU and Pearson's Recruitment Operations & Strategy. From late 2019 until early 2020, Hatch performed both roles effectively.

Kevin Worrell was a senior executive in a separate division of Pearson's Recruitment Services Department. In January 2020, he implemented a new compensation and evaluation plan for Pearson employees. Under Worrell's plan, Pearson supervisors were instructed to place their subordinate employees' recruitment goals and enrollment conversion rates, i.e., quantitative measurements, into a program called Mindtickle. Other evaluations based on employees' behavior, i.e., qualitative metrics, were stored in a separate system called Fusion.

Hatch alleges that Worrell's plan was designed to evade Title IV's incentive compensation ban by making it appear as though quantitative factors were not considered during employees' annual reviews when, in fact, they were. According to Hatch, "Pearson

is prohibited from compensating employees for directly or indirectly enrolling students because it leverages government funds." (Doc. 76 at 5.) Thus, Worrell's plan was "the basis for [an illegal] scheme to defraud the government," because "the Plan violated incentive compensation laws by compensating staff for directly or indirectly enrolling students." (Doc. 76 at 6.)

Hatch claims that he initially raised his Title IV concerns with Worrell during two conversations in January 2020. In the first conversation, Hatch told Worrell that he believed his proposed plan violated Title IV and urged Worrell to discuss the plan with Pearson's legal team. On February 27, 2020, Hatch told his supervisor, Mr. Stephen Dalla Betta, that Worrell's plan "amounted to a violation of incentive compensation laws," but, despite Hatch's warnings, Worrell ignored his concerns. (Doc. 76 at 6.) Hatch allegedly reiterated these concerns to Dalla Betta at the end of March 2020 and again on April 9, 2020. On April 14, 2020, Hatch claims that he provided Dalla Betta with a specific example of an employee entering enrollment conversion outcomes into the database used to determine compensation. On April 22, 2020, Dalla Betta says that he decided to fire Hatch for unrelated reasons. On April 28, 2020, Hatch made a final complaint to Dalla Betta about Worrell's plan.

Hatch's termination was finalized on May 10, 2020, and he was informed of his termination on May 12, 2020. (Doc. 101-1 at 4.) A few months later, Hatch brought this action under the False Claims Act's anti-retaliation provision. After some discovery, Defendants moved for summary judgment. The motions to strike, refile, and seal were submitted soon after.

**DISCUSSION**

**I.   Motion for Summary Judgment**

   **A. Standard of Review**

A court should grant a motion for summary judgment when the pleadings, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 184 (D. Ariz. 1999), *aff'd*, 15 F. App'x 540 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 317). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then the Court must deny the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. False Claims Act

Plaintiff brings this action under the False Claims Act ("FCA"), which "prohibits any person from making false or fraudulent claims for payment to the United States." 31 U.S.C. § 3729(a). Specifically, his allegations arise under the FCA's anti-retaliation provision, which protects employees who are fired for attempting to stop FCA violations. 31 U.S.C. § 3730(h)(1) ("Any employee . . . shall be entitled to [] relief . . . if that employee . . . is discharged . . . because of lawful acts done . . . in furtherance of . . . efforts to stop 1 or more violations of this subchapter."). To prove his claim for retaliation Plaintiff must show that: (1) he engaged in protected activity under the Act; (2) his employer knew that he was engaging in such conduct; and (3) his employer discriminated against him because of his protected conduct. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

#### 1. Protected Activity

As a threshold matter, an employee engages in protected activity where their actions were aimed at investigating (or reasonably could have led to) a viable FCA claim. *Jonassen v. Port of Seattle*, 550 F. App'x 384, 385–86 (9th Cir. 2013). Although Plaintiff need not prove a viable FCA claim to bring his retaliation action, he must show "that he had reasonably based suspicions of a false claim." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 846 (9th Cir. 2002). When assessing whether a plaintiff's suspicions of a false claim are reasonable, courts weigh the subjective and objective reasonableness

of his belief. *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017).

### i. Subjectively Reasonable

An employee's suspicion of fraud is subjectively reasonable when "the employee in good faith believes . . . that [his] employer is possibly committing fraud against the government." *Id.* Here, Hatch claims that he explicitly told two Pearson employees—Worrell and Dalla Betta—that he believed Worrell's new compensation and evaluation plan "was putting the organization at risk" and "defrauding the government." (Doc. 76 at 6.) Although Pearson argues that Hatch's only evidence on this point is his own testimony, the credibility of his testimony is an issue of fact for the jury to weigh. Accordingly, Hatch has sufficiently established that he had a good-faith belief that Pearson was committing fraud against government.

### ii. Objectively Reasonable

An employee's suspicion of fraud is objectively reasonable when an "employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Campie*, 862 F.3d at 908. In this case, testimony from Pearson's Director of Recruitment, Ms. Jessica Valenzula and Associate Director of Coaching and Development, Ms. Allison Jesson, support this point. Valenzula testified that she had concerns about Worrell's plan because it seemed "muddy," with respect to Title IV. (Doc. 101-2 at 54.) Likewise, Jesson stated that she told Ms. Alyssa Mazanek, Pearson's Director of Learning and Development, that part of the new plan "could be a violation of Title IV." (Doc. 101-3 at 39.) Given that both Valenzula and Jesson were trained on Title IV compliance, their belief that Worrell's plan possibly violated Title IV lends support to the reasonableness of Hatch's belief. Thus, if Worrell's plan amounted to a knowing violation of Title IV, a reasonable jury might conclude that Pearson explicitly or implicitly falsely certified that it would comply with the incentive compensation ban.

Still, Pearson argues that Hatch's suspicions were objectively unreasonable because he cannot show *facts* that would support a viable FCA claim. Indeed, "[t]he issue of

whether a plaintiff's conduct constitutes protected activity when the fraud he suspects is not actionable under the FCA and his investigation could not reasonably lead to a viable FCA action has not been decided by the Ninth Circuit." *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1101 (D. Or. 2012) (citing *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060 n.12 (9th Cir. 2011) (declining to decide this precise issue). Nevertheless, at least one court has held that for an employee's belief to be objectively reasonable, he "must establish that a reasonable employee in the same or similar circumstances might believe that" their employer's activities met all of the elements of an FCA claim. *Id.* at 1094. This standard is also met.

To establish a viable FCA claim under a false certification theory, a plaintiff must show (1) falsity of certification, not merely an unintentional regulatory violation, (2) made with the requisite scienter, i.e., the falsehood must be "an intentional, palpable lie," (3) that was material to the government's decision to provide a benefit, and (4) the existence of a claim, which Ninth Circuit defines as a "call on the government fisc." *Hendow*, 461 F.3d at 1173. Because Hatch's filings include some facts to support each of these elements, a jury could find that a reasonable person in Hatch's position might have believed that his conduct would lead to a viable FCA claim.

### *a. Falsity & Scienter*

First, Hatch has alleged that Worrell's plan falsely represented Pearson's compliance with Title IV's incentive compensation ban with the proper scienter; he does not suggest that Pearson committed unintentional regulatory violations. Hatch alleges that Worrell told him that the plan was "smoke and mirrors" and that Worrell said he intended "to withhold performance numbers in the system used for compensation but would then place the same performance numbers on an entirely different system so that the tie to compensation and enrolling students would be concealed." (Doc. 76 at 5.) That is, Hatch alleges that Worrell's plan intended to misrepresent Pearson's compliance with Title IV.

Additionally, documentary evidence and witness testimony suggests Pearson assured ASU it would comply with Title IV's incentive compensation ban. For example,

1  Hatch submitted a slide show created by Pearson's in-house legal team that implies
2  Pearson's business relationship with ASU depends on Pearson's compliance with Title IV,
3  including the incentive compensation ban. (Doc. 101-1 at 26–28 (noting under a header
4  titled "Incentive Compensation Regulation" that "[a]t the payroll practice level, we are
5  regulated in the same manner as a Title IV eligible institution. These obligations are
6  expressly confirmed by our contract with the partner").) Likewise, several witnesses
7  testified that Pearson mandates annual Title IV trainings for at least some employees
8  involved in student recruitment. Pearson's Vice President of Human Resources, Ms. Nikki
9  Zinman, also noted that Pearson hired an independent firm to conduct Title IV compliance
10 audits every year. (Doc. 101-2 at 33.)

### b. *Materiality*

12 Second, Hatch has shown that Pearson's misrepresentations were material to the
13 government's decision to provide a benefit. To prove materiality, a plaintiff must establish
14 a direct causal relationship between the government's decision to provide a benefit and an
15 entity's false representations of compliance with an obligation that is a precondition to
16 receiving that funding. *Hendow*, 461 F.3d at 1174. The Ninth Circuit has established that
17 a Title IV institution's representations about its compliance with the incentive
18 compensation ban are material to the government's decision to provide a benefit. *Id.*

19 To the extent that Pearson asserts that the retaliation provision does not apply
20 because Pearson "never requested funds from the federal government," it fails to take
21 account of relevant case law and the plain text of the statute. (Doc. 66 at 11). "A
22 subcontractor may be liable under § 3729(a)(1) even when it did not itself present any false
23 claims to the government if it engaged in a fraudulent scheme that induced the government
24 to pay claims submitted by the contractor." *United States v. Toyobo Co. Ltd.*, 811 F.
25 Supp.2d 37, 45 (D.D.C. 2011); *see also U.S. ex rel. Pogue v. Diabetes Treatment Ctr. of*
26 *Am., Inc.*, 238 F. Supp. 2d 258, 266 (D.D.C. 2002) ("An argument that the presentation of
27 the claims was the work of another is unavailing as a means to avoid liability under the
28 False Claims Act."). Further, the statute does not limit FCA claims to those instances

where the entity submitting a false claim for payment submits such a claim directly to the government. The language of the statute would also apply if, as Hatch claims, Pearson fired him because of his efforts to prevent ASU, the entity with which Pearson contracts, from submitting false claims to the government. As the above cases show, Pearson's assertions that it is not subject to false claims liability because it does not itself make any claims for payment from the federal government demonstrate a seeming ignorance about the possible scope of its potential false claims liability.

### *c. False Claim*

Finally, Hatch has alleged facts that constitute a "claim" within the meaning of the FCA. Pearson argues that Hatch cannot establish that he was investigating a viable FCA claim because he merely alleges Pearson's non-compliance with Title IV. (Doc. 66 at 13.) However, this Circuit established beyond question that if a Title IV institution knowingly misrepresents its compliance with Title IV's incentive compensation ban, it submits a "false claim" when it submits requests for Pell Grants or supports requests for federally guaranteed student loans. *Hendow*, 461 F.3d at 1173. Additionally, as mentioned above, Pearson's status as a contractor does not preclude FCA liability when its fraudulent schemes induce ASU to submit these kinds of claims to the government.

Ultimately, when a court considers whether a false claim exists "it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Id*. at 1174. Instead, to prove a "claim" under the FCA "all that matters is whether the false statement or course of conduct causes the government to pay out money or to forfeit moneys due." *Id*. at 1177 (cleaned up). In *Hendow*, for example, the court accepted that a university submitted a false claim when it falsely certified its Title IV compliance to private lenders for government-insured loans. *Id.* Pearson's alleged representations to ASU cause the federal government to pay out money in a far more direct sense than requests made to private lenders. Thus, despite Pearson's assertions to the contrary, Hatch has sufficiently alleged a "claim" under the FCA.

Accordingly, even under Pearson's alternative theory, Hatch has alleged enough

facts for a jury to find that his actions were objectively reasonable. As a result, he has shown sufficient facts upon which a jury could conclude that he engaged in protected activity.

### 2. Pearson's Knowledge

In addition to carrying his burden on protected activity, a "whistleblower must show [his] employer had knowledge the employee engaged in 'protected activity.'" *Hopper*, 91 F.3d at 1269. That is because "unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." *Id.* In the Ninth Circuit, an employer's knowledge can be shown when an employee establishes that someone who "influenced or was involved in the decision" to fire the employee was aware that he engaged in protected activity. *See Cafasso,* 637 F.3d at 1061.

Hatch has sufficiently alleged that Dalla Betta, the Pearson employee who ultimately terminated his employment, was aware of his protected activity. Dalla Betta was Hatch's supervisor, and according to Hatch's testimony, he told Dalla Betta that he believed Worrell's plan violated Title IV on five separate occasions. On February 27, 2020, Hatch alleges that he told Dalla Betta that Worrell's plan "amounted to a violation of incentive compensation laws." (Doc. 76 at 6.) Hatch allegedly reiterated these concerns to Dalla Betta at the end of March 2020 and on April 9th and April 14th. When Hatch supposedly raised the issue with Dalla Betta for a fifth time on April 28, 2020, Dalla Betta "became annoyed and frustrated with Hatch and told him to handle it with Worrell and instructed him not to bring the matter up to him again." (Doc. 76 at 7.)

For its part, Pearson claims that Dalla Betta did not have knowledge of Hatch's protected activity because (a) Hatch never engaged in protected activity, or, alternatively, because (b) Hatch had a duty to report Title IV violations by virtue of his job title, and, therefore, was subject to a heightened standard because "any reasonable employer would have perceived this as him simply carrying out an assigned duty, not furthering an FCA action." (Doc. 66 at 15 (quoting *Dunlap v. Imaging Assocs., LLC*, No. 3:14-CV-00143-

TMB, 2019 WL 4580611, at *17 (D. Alaska Sept. 20, 2019)) ("Under Ninth Circuit law, a plaintiff whose job responsibilities include compliance must meet a higher standard to place her employer on notice of protected activity.").) As stated above, Hatch has sufficiently shown facts from which a jury could reasonably conclude that he engaged in protected activity. Additionally, Pearson has not presented evidence that definitively suggests Hatch was obligated to report his Title IV concerns, and Hatch claims that he had no such obligation. At best, there are questions of fact that must be resolved before the Court can determine whether the heightened standard should apply.

### 3. Discrimination

Finally, Hatch has alleged facts that, when considered in the light most favorable to him, might allow a reasonable jury to find that he was terminated because he engaged in protected activity. On summary judgment in a Title VII[1] retaliation action, "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003). *But see Brazill v. Cal. Northstate Coll. of Pharmacy, LLC*, 949 F. Supp. 2d 1011, 1023–24 (E.D. Cal. 2013) (noting that temporal proximity cannot establish causation when an employee claims to have engaged in protected activity *after* experiencing discrimination). Further, "evidence of an employer's contemporaneous reaction to protected activity can be circumstantial evidence of retaliation." (Doc. 76 at 14 (quoting *Bell*, 341 F.3d at 866 (holding employer's contemporaneous displeasure with employee's complaints regarding racial comments and profiling was circumstantial evidence of retaliation)).)

---

[1] Both parties suggest that the "but for" causation standard used in Title VII retaliation actions should apply here. Although there is no binding case law on this point, the Ninth Circuit has found that Title VII standards apply when a court decides whether an employer's acts qualify as discrimination under the FCA. *Moore*, 275 F.3d at 847–848 ("[B]ehavior does not constitute retaliation under the False Claims Act . . . unless it would be sufficient to constitute an adverse employment action under Title VII."). Thus, the Court will adopt the parties' suggested standard for the purposes of this case.

Here, Hatch alleges that he was terminated after expressing his concerns to Dalla Betta and Worrell on multiple occasions, including several days before Dalla Betta allegedly decided to fire him. He also alleges that after he complained about potential Title IV violations, Dalla Betta disinvited him from organizational meetings, prevented him from attending meetings with ASU's president and board, and instructed him "not to attend or speak with ASU." (Doc. 76 at 14.) Thus, Hatch has sufficiently shown his prima facie case for his retaliation claim.

### 4. *McDonnell Douglas*

Even though Hatch established a prima facie case for retaliation under the FCA, Pearson claims that it's Motion for Summary Judgment should be granted because it has established "legitimate, non-retaliatory reasons" for Hatch's termination. (Doc. 66 at 16.) *McDonnell Douglas* requires a plaintiff to make out a prima facie case for retaliation, which, as outlined above, Hatch has done.[2] Thus, the burden shifts to Pearson to provide legitimate non-discriminatory reasons for terminating Hatch's employment, which Pearson has also done—for example, Dalla Betta provided a sworn statement that on January 3, 2020, he was told "budgetary pressures necessitated an imminent reorganization" of Hatch's group. (Doc. 101-2 at 3.) He also states that at some point between "late December 2019 and January 3, 2020" he expressed his belief that Worrell and Hatch's department should be "consolidated under one leader to have a single point of accountability in order to achieve improved performance outcomes." (Doc. 101-2 at 2.) Further, Dalla Betta provided calendar entries and meeting notes that show he was considering restructuring Hatch's department, including notes from a February 27, 2020 meeting, which show that Hatch apparently agreed with Dalla Betta that the group's two-leader structure was not

---

[2] Pearson effectively asserts (and Hatch does not contest) that Title VII's *McDonnell Douglas* burden-shifting analysis applies to Hatch's FCA retaliation claim. The Ninth Circuit has not addressed whether *McDonnell Douglas* is applicable in FCA cases. However, "many other courts," including this Court, "have applied the burden shifting analysis to retaliation claims." *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-GMS, 2018 WL 1784692, at *13 (D. Ariz. Apr. 13, 2018) (quoting *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012)) (citing *United States v. Health*, No. 13-CV-01924-SI, 2016 WL 3540954, at *12 (N.D. Cal. June 29, 2016)). So, the Court will apply the burden-shifting framework here.

optimal. (Doc. 101-2 at 3.) This all suggests that Dalla Betta had a non-discriminatory reason for terminating Hatch.

Accordingly, Hatch must demonstrate that these reasons were a pretext for discrimination. He offers several pieces of evidence to that end. He claims that Dalla Betta "never told [him] that he was performing his job poorly, never provided [him] with any written criticism concerning his performance, and never informed [him] that his job was in jeopardy." (Doc. 76 at 15.) Additionally, he claims that his alleged shortcomings were attributable to problems with ASU's technology infrastructure, and no one else in his group was terminated, despite sharing responsibilities that were negatively impacted by ASU's inability to process online applications. (Doc. 76 at 17.) Both of these arguments, and the others he offers in his Response, are enough to create questions of fact about whether Dalla Betta terminated Hatch because he engaged in protected activity.

Accordingly, the Defendant's Motion for Summary Judgment is denied.

## II.     Motions to Strike and Refile

The decision to grant a motion to strike lies within the district court's discretion. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). Defendants move to strike Plaintiff's Response to Defendant's Motion for Summary Judgment, Controverting Statement of Facts, and Separate Statement of Facts because these filings violate the page limits set out in Local Rules 7.2(e) and 56.1(b) by twenty-six pages.

Parties must comply with the Local Rules' page limits to ensure fairness to all litigants. When courts consider a motion to strike, "prejudice to the opposing party is only a factor [relevant to] determining [whether] good cause" exists to grant the motion. Here, the facts that formed the basis for denying Pearson' Motion for Summary Judgment were drawn exclusively from Hatch's properly filed Motions and Statements and Exhibits, not Hatch's Controverting Statement of Facts. Thus, although Hatch did not comply with the page limits, his noncompliance did not impact the Motion for Summary Judgment. Thus, although it is not without merit, the Court denies Defendant's Motion to Strike and Plaintiff's Motion for Leave to Refile. *McKeever v. CSAA Gen. Ins. Co.*, No. CV-18-

04822-PHX-SMM, 2020 WL 7016468, at *3 (D. Ariz. June 23, 2020).

Plaintiff also moved to strike every paragraph in Defendant's Statement of Facts that "includes statements of fact that contain several assertions that are not separately numbered, in violation of LR 56.1(a)" because he claims that he "will be obligated . . . to controvert each of Defendant's wandering-web of 'facts' or risk every assertion being deemed admitted or otherwise undisputed." (Doc. 75 at 1, 2.)  To the extent that this risk was real, it did not impact the result in this case.  *See Petty v. Arizona*, No. CV-15-01338-PHX-DLR, 2018 WL 2220665, at *2 (D. Ariz. May 15, 2018) (suggesting that the consequences of a successful motion to strike are within the district court's discretion). Plaintiff adequately responded to the portion of Defendant's Statement of Facts that was dispositive to the Court's decision and carried his burden on the Motion for Summary Judgment despite Pearson's noncompliance. (Doc. 67 at 1, 2).  Accordingly, the Court denies Plaintiff's Motion to Strike Defendant's Statement of Facts.

Please note, the Court only declines to strictly enforce its own Case Management Order and the Local Rules because it would be inconsistent with the "just, speedy, and inexpensive determination" of this action.  Fed. R. Civ. P. 1.  In the future, the parties are directed to strictly abide by mandatory page limits and other pleading requirements. *Larson v. United Nat. Foods W., Inc.*, No. CV-10-185-PHX-DGC, 2010 WL 5297220, at *1 (D. Ariz. Dec. 20, 2010).

### III.   Motion to Seal

Finally, the parties' Motion to Seal (Doc. 99) is granted.  A party seeking to seal "motions for summary judgment and related attachments" must overcome a "strong presumption of access to judicial records" and articulate "compelling reasons supported by specific factual findings" that justify sealing the records. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006).  Potential revelations of trade secrets, business strategies, and proprietary information can be "compelling reasons," *Foltz v. State Farm Mut. Auto, Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003), that justify motions to seal because such revelations "harm a litigant's competitive standing." *Nixon v. Warner*

*Commc'ns., Inc.*, 435 U.S. 589, 597-98 (1978). "If the court agrees that the party's compelling reasons outweigh the public's right to access, it must 'articulate the factual basis for its ruling, without relying on hypotheses or conjecture.'" *New Phase Dev. LLC v. Cook*, No. 4:13-CV-00520-REB, 2016 WL 1755374, at *3 (D. Idaho May 2, 2016) (quoting *Kamakana*, 447 F.3d at 1178–79).

The parties' renewed motion is responsive to the Court's previous Order (Doc. 96), which found the party's original motions to seal were overbroad. Here, the narrowed submission of sealed documents contains information solely related to Pearson's internal business practices, including "information about Defendant's day-to-day business practices; Defendant's strategic decision-making and recruitment tactics; fiscal situation and budget allocations; clients and lead lists; internal statistics on student enrollment; and private, internal communications." (Doc. 99 at 2 (cleaned up).) The Court agrees that Pearson has a compelling interest in sealing these documents that outweighs the public's interest in reviewing them. The revelation of this information would give Pearson's competitors insight into the company's operations in a manner that could hurt Pearson's competitive standing, for example, by allowing its competitors to develop similar goals and retention strategies. Additionally, all of the internal communications lodged at Doc. 100 involve strategic discussions about goal development, implementation of internal systems, and fiscal planning. Thus, although the internal communications will be sealed in their entirety, the public's interest in reviewing them is not outweighed by Pearson's interest in their continued confidentiality.

## CONCLUSION

Accordingly, **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 66) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Joshua Hatch's Motion to Strike Defendant's Statement of Facts (Doc. 75) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's Statement of Facts (Doc. 87) is **DENIED.**

1 **IT IS FURTHER ORDERED** Plaintiff Joshua Hatch's Motion to Leave or Refile
2 (Doc. 91) is **DENIED.**
3 **IT IS FURTHER ORDERED** that Defendant's Motion to Seal Document re:
4 Motion for Summary Judgment (Doc. 99) is **GRANTED.**
5 **IT IS FURTHER ORDERED** directing the Clerk of the Court to file under seal
6 the lodged Doc. 100.
7 Dated this 3rd day of January, 2023.

*[Signature]*
G. Murray Snow
Chief United States District Judge